Filed 11/14/17

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 2

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO G. GARCIA,<br><br>    Defendant and Appellant. | A139924<br><br>(Contra Costa County<br>Super. Ct. No. 51115815) |

Defendant Pedro G. Garcia, while staying as a guest in his sister-in-law's home, forcibly raped and sodomized his 12-year-old niece, who was also his sister-in-law's guest and family member. He was convicted by a jury of forcible sex crimes, including a forcible lewd act against a child under the age of 14 in the course of a first degree burglary. The burglary finding led to a statutorily mandated sentence of life without parole under the "One Strike" law and is at the crux of many of defendant's challenges. His principal argument is that the burglary finding cannot stand because he was an invited overnight guest in the home and bedroom where he forced himself on his young niece. The law, however, is to the contrary.

At first blush, defendant's argument has some appeal since we commonly associate burglary with strangers breaking and entering a home and not with acts by

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Background Part I(G) and Discussion Parts III, IV, and V.

1

invited guests. But our burglary statute, Penal Code section 459,[1] reaches beyond this common understanding to punish any entry into a home or a room within a home, so long as the person enters with the intent to commit a felony and without the authority to do so. Our case law confirms the statute's broad reach. Defendant contends this should not be the case because it is less heinous and less dangerous to commit a crime in a room of a home in which one is an overnight invitee than to commit the same crime after breaking and entering the home. Even if this were so, we would be bound by the statutory definition. But defendant's premise is also false, and demonstrates the wisdom behind the broad reach of our burglary law.

Our homes are sanctuaries, places of refuge and safety. When we invite another into our home, we trust him not to harm us or those who reside with or visit us there. The trust we repose in an invitee renders us, our family members and guests particularly vulnerable. Unlike the intruder, our invitee's presence does not engender fear, and we therefore are not on guard or prepared to protect against him. Precisely because we expect to be safe in our homes and with our invited guests, an invitee who preys on someone within our home is as dangerous and as heinous as the burglar who intrudes by picking the lock or climbing in the window. Defendant's argument that his conduct is less menacing and less blameworthy than that of the common burglar is ultimately unpersuasive. His conduct was at least as heinous and dangerous as that of an invading stranger.

Defendant makes several other arguments, including that the trial court committed prejudicial error in instructing the jury on burglary and in admitting evidence of uncharged prior sex offenses he was alleged to have committed against his niece, Jane Doe I, and another child to whom he was closely related; improperly ordered him to pay Jane Doe I $75,000 in restitution; and imposed a sentence that violates the constitutional

---

[1] All statutory references are to the Penal Code unless otherwise stated.

prohibition against cruel and unusual punishment.  We conclude all of his arguments lack merit.  Therefore, we affirm the judgment.

## BACKGROUND

In July 2013, a trial was commenced against defendant on three felony counts brought by the Contra Costa District Attorney regarding his sexual conduct on April 17, 2011, with Jane Doe I:  aggravated rape of a child under the age of 14 and 7 or more years younger than defendant (§ 269, subd. (a)(1); count one); aggravated sodomy of a child under the age of 14 and 7 or more years younger than defendant (*id.*, subd. (a)(3); count two); and commission of a forcible lewd act upon and with the body of a child under the age of 14 (§ 288, subd. (b)(1); count five).  Count five was accompanied by certain allegations, including the special circumstance allegation that defendant committed this forcible lewd act during the commission of a first degree burglary, exposing him to a sentence of life without the possibility of parole.  (§ 667.61, subds. (c)(4), (d)(4) & (j)(1); § 460, subd. (a).).  The record indicates defendant was 47 years old at the time of the alleged incidents.

## I.

### *The Prosecution's Case*

#### A.  Jane Doe I's Recorded Interview

On April 28, 2011, 11 days after the incident, Jane Doe I spoke with a forensic interviewer at the Children's Interview Center (CIC) in Martinez in a video-recorded interview.[2]  A portion of this recording was admitted into evidence and played for the jury.

Jane Doe I told the interviewer that she was getting ready for a baby shower in an aunt's room when her uncle came into the room through an open door, closed the door

---

[2]  The video-recording is not contained in the record.  We summarize the interview from a transcript of the interview that was admitted into evidence to aid the jury's review of the video-recording.

3

and locked it. He pushed her to a bed, took off her belt and pulled down her pants almost to her knees; she had nothing on underneath. He unzipped his pants and took out his "bird." He got on top of her and "started raping" her, putting his "part" in her repeatedly, and kissing her, and she saw something white come out of his part. She tried to push him off but could not. Her aunt came to the door and knocked. When there was no answer, the aunt was able to push the poorly closed room door open and came into the room after her uncle had gotten off of her. He left the room. Her aunt told Jane Doe I she needed to talk to her.

### B. Jane Doe I's Trial Testimony

Jane Doe I, who was 14 at the time of trial, testified that a little more than two years earlier, on April 17, 2011, she was at the house of her aunt, Esmeralda, preparing to attend a baby shower taking place next door. She was in a room of Esmeralda's house fixing her hair, with the room's door halfway open, when defendant came into the room. He was Jane Doe I's uncle by marriage to another aunt. He asked her if she had seen his son, Junior, and she said she had not. He left the room, but returned about 10 seconds later and "just started looking around if nobody was coming." He "touched [her] and stuff like that."

Jane Doe I further testified that defendant pushed her down onto a bed, pulled her pants and underwear down and began touching her legs. He then pulled down his own pants and underwear, laid down on the bed and put his penis into her vagina. Jane Doe I tried to push defendant off her with her legs, but he was too strong. He told her, "Tell it to nobody."

About five minutes after he attacked her, Jane Doe I testified, she heard Esmeralda outside the room. Defendant left the room. Jane Doe I's underwear and pants were still down by her knees when Esmeralda entered the room. Jane Doe I ran into another aunt's room. Esmeralda followed and asked her what had happened. Jane Doe I talked with her

4

for about 10 or 15 minutes. Esmeralda told her to call her mother. The two then went next door to the baby shower.

Jane Doe I was asked at trial, "Prior to the day of the baby shower, had [defendant] ever done anything like this to you before?" She said "he did" every time she went to his home in Los Angeles when she was six years old, usually in his bedroom. She answered affirmatively when asked if "this stuff happened" more than five times. On cross-examination, she said she never told anyone about defendant's earlier assaults when they happened.

### C. Esmeralda's Testimony

Esmeralda testified that as of April 17, 2011, she lived in a house in Oakley, California with her husband, children, sister-in-law and sister-in-law's child. Jane Doe I was her husband's niece and defendant was married to another of Esmeralda's sisters-in-law.

On the weekend of April 17, 2011, Esmeralda said, defendant, his wife and their children stayed at her house in order to attend a family birthday party at Esmeralda's house on Saturday and a family baby shower on the same street on Sunday. Defendant and his family had stayed at her house before and had permission to sleep in the living room or bedrooms, but Esmeralda could not recall whether defendant slept in her bedroom that weekend. However, Esmeralda said, she never would have given him permission to go into her house or her bedroom to sexually assault Jane Doe I.

Esmeralda said that on the day of the baby shower, she left her house around 4 p.m. to attend the baby shower. Jane Doe I stayed behind to change her blouse. Defendant was making himself coffee in Esmeralda's kitchen. After 10 to 15 minutes at the baby shower, Esmeralda walked back to her house with her daughter to get a sweatshirt, with her daughter walking a little ahead of her. Esmeralda's daughter went into the house and to Esmeralda's bedroom, pushed open the door and ran into the room. The door had a lock on it, but it did not lock readily. Esmeralda saw defendant walk out

5

of her bedroom and go towards the kitchen. She went into her bedroom, where Jane Doe I was sitting on the bed lifting up her pants and underwear, which were inches above her knees. When Esmeralda asked Jane Doe I what was going on, Jane Doe I ran into the next room. Esmeralda followed her and they talked. Jane Doe I said defendant "had touched her." Esmeralda told her to tell her mother.

### D. Testimony Regarding Jane Doe I's Medical Examination

A forensic examiner at the Contra Costa Regional Medical Center testified that she conducted a sexual assault examination of Jane Doe I on April 21, 2011, four days after the incident. Jane Doe I told the examiner that defendant took off her clothes and pushed her onto a bed in a room. Defendant, while on top of her, put his "weenie," a word she used for penis, in her "privacy," a word she used for vagina, "[a]nd was going up and down and in and out and it hurt a lot." He put her legs on his shoulders, also put his weenie in her "cola," a word she used for her anus, and kissed her on the mouth. During his assault of her, she hurt a lot in her "cola" and "privacy."

The examiner used blue dye to search for tearing or breakage of the skin that was not observable with the naked eye, and photographs of the examination were admitted into evidence. The examiner found a tear or rip in the skin of the perineum, which is between the anal and vaginal openings, but she did not document any injuries internally during the course of a vaginal speculum exam. She also found some internal bruising in Jane Doe I's anus.

### E. Expert Testimony on Child Abuse

A pediatrician with Contra Costa County Health Services testified as an expert on child abuse and the interpretation of the forensic examiner's exam of Jane Doe I. The expert reviewed the forensic examiner's report of her examination of Jane Doe I. He noted the anal region showed a healing fissure of the anal ring, an injury that was "fairly recent and certainly consistent with . . . four days," and which could have been caused by penetration if the area was stretched more than it could accommodate. Also, the

anoscopic exam inside Jane Doe I's rectum showed a large bruise of the rectal mucosa tissue. This was "significant" because "[p]retty much you need to have an erect penis just to penetrate beyond the anus. . . . [M]ost sodomy victims don't get bruises here." Also, there was a recent abrasion or laceration of the perineum, which he thought was caused by a rubbing or stretching trauma. It was "often . . . associated with both penetration and attempted penetration of the anus and vagina." The examination results were consistent with Jane Doe I's reported history.

The expert also opined that in a majority of cases, child sexual abuse is kept a secret. The children who do make revelations often do so "days, weeks, years after the event," often revealing only part of what happened. Children have trouble disclosing to one interviewer versus another and sometimes will retract things because of influence from family members. Also, children's ability to talk about what happened is often affected by their own fear and shame. Sodomy is "the part of sexual contact that is least likely to be shared" because of the shame attached to it. The majority of studies indicated that children, rather than exaggerate, make a partial revelation, if they make a revelation at all.

### F. Defendant's Statements to Police

On May 5, 2011, Detective Jose Rivera of the Contra Costa County Sheriff's Office conducted a video-recorded interrogation of defendant that was admitted into evidence and played for the jury.[3]

Defendant said that he stayed in Oakley with his family about three weeks before for two family events, a birthday party and a baby shower, although he did not attend the baby shower. Rivera told him that a 12-year-old girl told her mother that defendant had

---

[3] This video recording also is not contained in the record. We summarize the interrogation from a transcript that was admitted into evidence to aid the jury's review of the recording. The transcript is an English translation of the interrogation, which was conducted in Spanish.

"fooled around with her" and "abused" her during the visit. Defendant, after confirming with Rivera that the girl had accused him of "raping" her, denied abusing her. He said she was "sick for sex" and that " 'the way [she] grabbed me . . . she wants sex like crazy.' "

Rivera asked defendant to clarify what he meant. Defendant said the girl "stuck her hand in me" when they were watching television with other children, and that he stood up and told her, " 'No.' " He "had a hard on," but "didn't do anything to her there." Instead, he went to have some coffee, and then went to a room in the house where he kept some clothes. When he went in the room, the girl was there and said, " 'Close the door, uncle!' " She hugged him, put her hand inside of his pants and grabbed him, causing him to "lose [his] mind." Her pants were off and her underwear was on. He told her, " 'No, no, no, no,' " and referred to his coffee. He left the room, the girl stayed there, and his brother-in-law's wife went into the room. Defendant suggested to Rivera that "they" had "hit" the girl shortly before this incident because "she was kind of teary-eyed."

Rivera then told defendant that the girl said defendant had put his penis in her vagina, and also that the girl had been medically examined. After Rivera implied that the medical exam indicated defendant had put his penis in the girl's vagina,[4] defendant admitted that he had. He said if the doctor said he had, "well, that's it, like he says, it was put inside her." Asked further questions, defendant said he had sex with the girl with his pants down and her legs on his shoulders, and that she was "asking for it like crazy." He thought she was 14 years old.

Defendant then gave a variety of different accounts of the incident. He said that "[w]hen this little girl climbed on top of me there on the bed, I couldn't get it up." He

---

[4] Rivera testified at trial that, at the time of the interrogation, this statement was inaccurate and that he used it as a questioning technique.

was not sure he put his penis in the girl's vagina because he "wasn't lucky; it didn't want to stand up." Asked to describe events from when he entered the room, defendant said "she made me lose my mind." She closed the door to the room and put her hand "inside," but he could not "get it up" because he was too nervous they would be caught. She pleaded with him to "make love" to her. She climbed on top of him as he lay on the bed, but he "didn't feel that I put it in because . . . I know that there were people outside." She was "pretty strong," and "pulled it out" of him. She pulled on "it" and wanted to "stick it inside her." He told her " 'No, no,' " because there were people outside, and tried to push her off him.

Defendant also said he had become erect when the girl was on top of him. He "didn't put it in her that much," but he "might have put it inside her just a little bit," "because she's really chubby." Defendant also said that if the girl became comfortable with Rivera, Rivera would "see how she gets all over you." He continued, "Her mind is sick and she wants sex," and looks on the Internet "at all that." He suggested she had flirted with him before but, he said, "to be honest, I've never liked chubby women."

Asked how long the girl was on top of him, defendant said she was only on top of him for about thirty seconds. He said he told her, " 'No, honey,' " and " 'Hold on, hold on,' " but she did not care. He repeatedly said he felt his penis did not penetrate the girl, and added, "Because, honestly, on that girl, you can't even see where it can go inside." He did not ejaculate with the girl and did not sustain an erection. He was "positive that it didn't get erected" because she was too chubby for him.

Defendant also said he had sex the night before with his wife, wiped himself on his wife's t-shirt and threw the shirt on the floor. When he was with the girl, "the door was halfway open. I knew if someone came in they would find us. And that's when I wanted to, honestly, because I thought and said, 'Why did I do it last night? Then I maybe could have done it right now.' Right? 'Why did I do this to my wife?' " When Rivera showed him a medical report and indicated defendant's sperm was found,

9

defendant said he had not showered from the night before. He repeatedly denied penetrating Jane Doe I's vagina or anus.

Defendant also claimed that even if he went to jail, the girl should tell the truth when she came of age, and that "it wasn't me who did this to her." He said repeatedly that when he went into the room, "[s]he wanted me," and that he thought she was "kind of sick." He also thought it was "very weird" that her father took a bath for a couple of hours with "them," apparently including the girl. Eventually, defendant indicated he wanted to talk to a lawyer and the interrogation stopped.

### G. Jane Doe II's Testimony

Jane Doe II also testified. She was defendant's daughter and 12 years old at the time of the trial. She said her family would visit Oakley, California almost every year and stay at one of two aunts' houses there. During one visit, she and her family slept in the living room of one of her aunts. She woke up around 7:00 a.m. or 8:00 a.m. to discover defendant putting his penis in her "butt" and moving it back and forth. She turned around, saw defendant, and got up. She did not talk with defendant about it. This was the only time defendant touched her inappropriately. She could not recall her age at the time.

Jane Doe II testified that the first person she told about this incident was an aunt named Candy, whom she told in about April 2013. She did so after her mother told Candy that Jane Doe II wanted to talk to a detective, and after Jane Doe II knew defendant was accused of doing something to her cousin. Before that time, she had said defendant had not done anything to her when asked. She also wrote letters to defendant in jail telling him she loved him and wanted him to come home, and visited him in jail with her mother.

10

## II.

### *The Defense Case*

#### A. Criminalist Testimony

A criminalist with the Contra Costa County Sheriff's Office Crime Laboratory testified about the sexual assault examination evidence. Given the time that had passed since the alleged assault and other circumstances, she examined only those items that she thought, based on her training and experience, might show indications of sperm. These were a vaginal smear, a cervical swab and a rectal swab. She did not find any sperm.

#### B. Expert Testimony

A registered nurse and forensic sexual assault nurse examiner testified as an expert in sexual assault examinations, the interpretation of those results and the protocol in conducting them. She had reviewed the materials and photographs collected in the sexual assault examination of Jane Doe I and did not find any definitive evidence that penetration had occurred. She testified that abrasions on the perineum are much more frequently caused by rubbing of clothing or a person scratching herself than from sexual activity. She did not think the abrasion found on Jane Doe I's perineum was caused by penetration because it was too far from any opening where penetration could occur.

The expert also disagreed that the photographs of Jane Doe I's rectum showed an internal bruise that was consistent with blunt force trauma, instead characterizing what she saw as a "coloration possibly." She said injuries from sexual activity are more likely to be in the vulva. She did not observe any injuries to Jane Doe I's vulva and found no physical evidence that was absolutely predictive of prior sexual activity.

#### C. Defendant's Testimony

Defendant testified that he, his wife, and children stayed in Esmeralda's room on the weekend of April 17, 2011, and kept their clothes, suitcases, and possessions there as well. He and his wife slept in one bed and his children slept in another. He had sex with his wife the night before the baby shower.

11

Defendant further testified that on the day of the baby shower, he was outside Esmeralda's house with other relatives and friends. He went inside to get money from his pants, which were in Esmeralda's room. When he opened the door to the room and walked in, he was surprised to see Jane Doe I lying on a bed with her pants down. He left the room after about 40 seconds. He did not touch Jane Doe I or take her clothes off, and she did not touch him. Jane Doe I and her family would occasionally visit his family, but he did not touch her or take off her clothes on any occasion.

Defendant was asked to explain his statements to Detective Rivera. He testified that one of his brothers-in-law told him things indicating he would be harmed in prison by the brother-in-law's friends. As a result, he felt threatened and thought someone was going to hurt him; he indicated this led him to make untrue statements to Rivera about physical contact between himself and Jane Doe I, and about Jane Doe I's behavior, because he wanted Rivera to arrest him in order to protect him. In fact, Jane Doe I did not touch him or get on top of him. He also made inaccurate statements because, he said, Rivera "was pressing me in such a way that he wanted me to say something." Although Rivera did not threaten him, he felt "press[ed]" because of the way Detective Rivera was asking him questions and looking at him. Defendant also was confused about which girl Rivera was referring to, since there was another, older girl also present at the party that weekend, although defendant did not have sexual contact with her either. He also never inappropriately touched Jane Doe II.

### III.

### *Jury Verdict and Sentencing*

The jury found defendant guilty of committing aggravated rape and aggravated sodomy on a child under the age of 14 who was 7 or more years younger than defendant (counts one and two). It also found him guilty of committing a forcible lewd act upon a child under the age of 14 (count five), and found true the accompanying allegations that

12

he committed this act during the commission of a first degree burglary and in the course of having substantial sexual conduct with Jane Doe I.

Based on the jury's verdict and findings on count five and the related first degree burglary allegation, the trial court sentenced defendant to life without the possibility of parole. It imposed consecutive terms of 15 years to life for defendant's convictions on counts one and two, but stayed these terms under section 654. Defendant filed a timely notice of appeal.

## DISCUSSION

### I.

### *Defendant's Challenges to the Jury Finding That He Committed a First Degree Burglary Lack Merit.*

Defendant first argues that the evidence was insufficient to support the jury finding that he committed a first degree burglary. He fashions this argument as one about the insufficiency of the evidence, but his contention is primarily a legal one: that as an invited overnight guest staying in the room where the incident with Jane Doe I occurred, he could not as a matter of law have committed a first degree burglary. We first address this legal contention, and then address the sufficiency of the evidence to support the finding.

**A. Defendant Could as a Matter of Law Be Found to Have Committed First Degree Burglary.**

The jury found defendant guilty of committing a forcible lewd act upon a child under the age of 14 during the commission of a first degree burglary, which led to the court imposing a mandatory sentence of life without the possibility of parole. Defendant contends we must reverse the jury's finding that he committed a burglary because, as an "invited guest in the home where the assault allegedly occurred and because the room in which it occurred was the room where he was staying with permission of the owner

13

during the visit, his conduct did not meet the legal definition [of] burglary."  This is incorrect.

Defendant's argument requires that we interpret the burglary statute, section 459, which is an issue of law that we determine de novo.  (See *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.)  Defendant was sentenced to life without the possibility of parole under section 667.61, the so-called "One Strike" law.  (*People v. Sasser* (2015) 61 Cal.4th 1, 7.)  The One Strike law was " 'enacted to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction.' "  (*People v. Luna* (2012) 209 Cal.App.4th 460, 471.)  "Heightened sentences are intended when 'the nature or method of the sex offense "place[d] the victim in a position of *elevated vulnerability*." ' "  (*Ibid.*)  Under the One Strike law, a court "shall" sentence persons who commit, among other things, a forcible lewd act upon a child under the age of 14 (see §§ 667.61, subd. (c)(4), 288, subd. (b)) during the commission of a first degree burglary (see § 667.61, subd. (d)(4)) to "imprisonment in the state prison for life without the possibility of parole."  (§ 667.61, subd. (j)(1).)

A person commits burglary when he or she "enters any house [or] room . . . with intent to commit grand or petit larceny or any felony."  (§ 459.)  "Every burglary of an inhabited dwelling house . . . is burglary of the first degree."  (§ 460, subd. (a).)  "[S]ince burglary is a breach of the occupant's possessory rights, a person who enters a structure enumerated in section 459 with the intent to commit a felony is guilty of burglary . . . ."  (*People v. Salemme* (1992) 2 Cal.App.4th 775, 781.)  There are two exceptions, for persons who, first, have "an unconditional possessory right to enter as the occupant of that structure" or, second, are "invited in by the occupant who knows of and endorses the felonious intent."  (*Ibid.*)

"[A] possessory right is the right to exert control over property to the exclusion of others."  (*People v. Salemme*, *supra*, 2 Cal.App.4th at p. 779, citing *People v. Gauze* (1975) 15 Cal.3d 709, 713 (*Gauze*).)  "A person has a right to be in a structure when he or

14

she has an unconditional possessory right to enter . . . or where the person has expressly or impliedly been invited to enter and does so for a lawful reason." (*Salemme*, at p. 779.) Thus, homeowners and permanent occupants cannot commit a burglary in their own dwelling because they cannot intrude on their own possessory right. For example, in *Gauze*, a defendant was convicted of assault with a deadly weapon and burglary when he quarreled with one of his two roommates in their apartment, left and then reentered the apartment with a shotgun and shot the roommate. (*Gauze*, at p. 711.) The appellate court reversed the burglary conviction because "defendant cannot be guilty of burglarizing his own home. His entry into the apartment, even for a felonious purpose, invaded no possessory right of habitation . . . . More importantly, defendant had an absolute right to enter the apartment . . . that could not be conditioned on the consent of defendant's roommates." (*Id*. at p. 714.)

Defendant argues that an invited overnight guest falls under this "possessory right" exception and, therefore, as a matter of law, he could not burglarize the room in Esmeralda's house where he was staying and where the incident with Jane Doe I occurred. As defendant acknowledges, there are cases where invited guests in homes were found to have burglarized rooms in those homes. (See *People v. Abilez* (2007) 41 Cal.4th 472, 508–509 [defendant found guilty of burglarizing his mother's room in her home, although he lived in the home]; *People v. Richardson* (2004) 117 Cal.App.4th 570 [defendant invited to stay on the living room couch burglarized the bedrooms of his sister and her roommate by his unauthorized entry into, and taking items from, those rooms].)[5]

---

[5] Further, case law makes clear that a person can be found guilty of burglary when engaging in an unauthorized entry for the purpose of committing a felony sexual assault, such as rape. (See *People v. Fond* (1999) 71 Cal.App.4th 127 [defendant was properly convicted of first degree burglary when, while a patient in a locked psychiatric hospital, he raped a female patient in the female patient's hospital room].)

15

He argues that Esmeralda authorized him to enter her bedroom that weekend, while the guests in *Abilez* and *Richardson* had no equivalent authorization. He further contends that "he had a sufficient interest in occupying the room that the burglary statute served no purpose to protect against unauthorized entry, especially where Jane Doe I was not an overnight guest in the residence or invited to stay in that room, giving her an expectation of protection against [defendant's] entry. As the court in *Gauze* noted, burglary statutes are designed to protect a possessory interest and not to 'preserve any place from all crime.' (*People v. Gauze*, *supra*, 15 Cal.3d at [p.] 713.)"

Defendant's reliance on his status as an invited overnight guest is misplaced. As an invitee, he did not have an *unconditional* possessory right in Esmeralda's bedroom; nor, as Esmeralda testified, did he have her consent to enter her bedroom in order to commit a forcible lewd act against Jane Doe I. That is what is required to establish an exception to the burglary statute. (See, e.g., *In re Andrew I.* (1991) 230 Cal.App.3d 572, 579 ["Permission to enter, whether express or implied, does not confer upon the entrant an unconditional possessory interest in the premises. These two concepts are not synonymous"].)

Further, that Jane Doe I may not have a possessory interest in the room is not relevant. Esmeralda, as homeowner, did have a possessory interest, which included an interest in protecting her visitors, such as her niece Jane Doe I, from an invited guest's unauthorized entry into a room of her home to commit a felony.

Defendant also implies that an overnight guest in a home has a constitutional privacy interest that is implicated if we conclude that he could commit a burglary in

Also, it is of no consequence whether defendant formed his felonious intent when he was already in Esmeralda's house. (*People v. Sparks* (2002) 28 Cal.4th 71, 73 [concluding that "a defendant's entry into a bedroom within a single-family house with the requisite intent" can support a burglary conviction although "that intent was formed only after the defendant's entry into the house"].)

Esmeralda's room.  Defendant relies entirely on a United States Supreme Court case, *Minnesota v. Olson* (1990) 495 U.S. 91.  The case involved the police entering a house without a warrant or consent in order to arrest an overnight guest staying there, which the court determined violated the guest's privacy and Fourth Amendment rights.  (*Id.* at p. 93.)  Defendant does not show how these rights have any bearing here, and it is not apparent that they do.

In short, we conclude that as a matter of law, defendant, as an invited overnight guest in Esmeralda's home, could be found to have burglarized the room in which he was staying in order to commit a forcible lewd act against Jane Doe I.

## B. Sufficient Evidence Supports the Jury's Finding That the Count Five Burglary Allegation Was True.

Defendant frames his argument about the burglary allegation as a challenge to the sufficiency of the evidence that he committed a burglary.  We conclude there was sufficient evidence.

When reviewing the sufficiency of evidence, the appellate court must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 562.)  "Substantial evidence" is " 'evidence that "reasonably inspires confidence and is of 'solid value.' " ' " (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)  "We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the [decision maker] reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

17

As we have discussed, the burglary statute requires that a defendant enter into a house or room *with the intent to commit a felony*.  (§ 459; see *People v. Sparks, supra*, 28 Cal.4th at pp. 73–74.)  Defendant does not dispute on appeal that he entered Esmeralda's bedroom and committed felony sexual assaults, including a forcible lewd act against Jane Doe I.  Jane Doe I's statements provide substantial evidence that defendant, at the time he entered Esmeralda's room, had already formed the intent to commit this forcible lewd act.  Jane Doe I told the forensic interviewer at the Children's Interview Center that defendant came into the bedroom where she was fixing her hair, left and then reentered the room, closing and locking the door as he reentered.  She testified that when he came back into the room he "just started looking around if nobody was coming."  In both accounts, Jane Doe I indicated that defendant then proceeded to sexually assault her.  It can be reasonably inferred from this evidence that defendant entered the room with the intent to commit a felony, i.e., a forcible lewd act against her.  We therefore find that sufficient evidence supports the jury's finding that defendant committed a first degree burglary.

## II.

### *The Trial Court Erred in Its Burglary Instruction to the Jury, But Its Error Was Harmless.*

Defendant next contends that the trial court's jury instruction on burglary "misdescribes an element" of the offense, misstates a defense upon which he did not rely, and relieved the prosecution of the burden of proving beyond a reasonable doubt each element of first degree burglary.  He claims this prejudicially violated his federal constitutional right to due process and requires that his sentence of life without the possibility of parole be vacated.  We conclude the court's instruction was erroneous, but the error was harmless.

### A.  The Relevant Proceedings Below

18

The trial court instructed the jury on the elements of burglary using a modified version of CALCRIM No. 3178. Its instruction included the following: "The owner of a home may give a guest conditional or unconditional permission to enter his/her home or a room in that home. It is a defense to burglary that the defendant entered the room with the unconditional permission of the owner of the residence. It is not a defense to burglary if the defendant entered the room for a purpose which was not explicitly *or impliedly* agreed to by the owner. . . . The People must . . . prove that at the time he entered the room the owner of the residence had not consented to his entry into the room for that purpose." (Italics added.)

In his closing argument, the prosecutor contended defendant's conduct was not the typical burglary, i.e., "someone breaking into a home." He told the jury to determine the burglary allegation in part based on whether "the defendant entered the room for a purpose which was not explicitly or implicitly agreed to by the owner."

Defense counsel did not object to the prosecutor's characterization of the consent issue. To the contrary, in his own closing remarks, defense counsel agreed that, as the prosecutor "pointed out[,] in our traditional concept of burglary, is the masked man breaking into the house in the middle of the night to steal your VCR or whatever. . . . [¶] Here we don't have anything close to that. We have conflicting evidence of what happened, but somebody enters a room—somebody enters a room where they keep their possessions. That's Mr. Garcia, in his room, where he keeps his possessions. Mr. Garcia enters a room where he spent the night. Mr. Garcia has a room where his money, wallet and clothes are. He enters a room, and the person in the room, (Jane Doe No. 1), it's not even her room, it's her Aunt Esmeralda's room."

Then defense counsel, after noting that defendant was required to have the intent to commit the charged offense when he entered Esmeralda's bedroom, stated, "And, again, if Mr. Garcia broke into some stranger's house or if that was evidence, you know, and then—and started attacking them, whatever, that's a whole different situation than

19

what we have here. [¶] And I don't disagree with arguments counsel made about the consent by Esmeralda. He is absolutely correct. I'm not here to attack his interpretation of the law, but this is a factual determination that you have to determine."

## B. Analysis

Defendant implies the trial court should not have given *any* instruction about the homeowner's consent because he did not raise this defense. We disagree. " 'The law imposes on a trial court the sua sponte duty to properly instruct the jury on the relevant law . . . .' " (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1499.) Although defendant did not explicitly rely on a consent defense, his attorney suggested this defense when he contended that this was not a normal burglary because defendant was staying, and keeping his possessions, in the room where the incident occurred, and that this was not Jane Doe I's room. Thus, the defense put at issue the scope of defendant's authority from Esmeralda to use the room. Therefore, we have no quarrel with the trial court providing an instruction on the issue of consent.

However, we agree with defendant that the trial court provided an erroneous instruction on the issue of consent. We review de novo whether a court's jury instructions correctly state the law. (*People v. Jackson* (2010) 190 Cal.App.4th 918, 923.) Put simply, "[a]ny person who enters a building or room with the intent to commit larceny or any felony is guilty of burglary (§ 459)." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1325.) In other words, as defendant points out, the absence of consent is not an element of a burglary; rather consent is a defense. (See, e.g., *People v. Felix* (1994) 23 Cal.App.4th 1385, 1397 (*Felix*) ["There are occasions when consent given by the owner of the property will constitute a defense to a burglary charge"].) The trial court erred when it instructed the jury that the prosecution had to show an absence of consent, in effect adding an extra element that the prosecution was not legally required to prove.

Defendant also contends the trial court incorrectly indicated it was a defense to a burglary charge that the homeowner "impliedly" agreed to the commission of the

20

underlying felony in the home.  We agree.  The conduct of a property owner who "*actively* invites" a person to enter the property "*knowing* the illegal, felonious intention in the mind of the invitee" may be the basis for a defense to burglary, "[b]ut the invitation by the owner to enter *must be express and clear*; merely standing by or passively permitting the entry will not do."  (*Felix*, *supra*, 23 Cal.App.4th at pp. 1397–1398, final italics added.)  Thus, in *Felix*, the court held the defendant was not entitled to a jury instruction on a defense to a burglary charge that was based on his sister's implied consent to his entry into her home, even though she testified that there was "a silent family *understanding* that any of them could come and go from her home at will."  (*Id*. at p. 1399.)  The trial court's instruction here indicated such an understanding was sufficient, i.e., "[i]t is not a defense to burglary if the defendant entered the room for a purpose which was not explicitly *or impliedly* agreed to by the owner."  (Italics added.)  This was also error.

But these two errors *favored* defendant and, therefore, we conclude they were harmless.  Regarding the first error, the addition of an "absence of consent" element to burglary, defendant argues the prosecutor focused on this "inapplicable and erroneous principle to argue that the jury should not consider that [defendant] had a possessory right in the room which prevented a finding of burglary" and, that the trial court somehow directed a verdict on this issue.  As we have discussed, there is no law or evidence that, as an invited overnight guest, defendant had an unconditional possessory right as an invited overnight guest.  Further, the added element increased the prosecution's burden and gave the jury an unwarranted basis for finding the burglary allegation *un*true.  Therefore, defendant was not prejudiced by the error.

Similarly, regarding the second error, as the People contend, "the instruction, by permitting implicit as well as explicit agreements, could only have helped" the defendant's case.  We agree.  By allowing the jury to consider implied consent, the court gave defendant a greater, not lesser, chance of defeating the burglary allegation.

21

Nonetheless, the jury's verdict of guilt indicated it found there was no consent—express *or* implied. No rational juror could have found otherwise, as no evidence indicates that Esmeralda or any member of her family consented to defendant's entry of Esmeralda's bedroom for the purpose of committing a forcible lewd act against Jane Doe I. We conclude the trial court's errors were harmless, whether evaluated under the federal or state standard for prejudice. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [federal]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [state].)[6]

## III.

### *The Court's Admission of, and Instruction Regarding, the Evidence of Prior Uncharged Sex Offenses is Not a Basis for Reversal.*

Defendant next argues that the trial court abused its discretion by admitting evidence that he committed prior uncharged sex offenses against Jane Doe I and Jane Doe II without determining its reliability, an argument with which we disagree. He also claims the court's instruction to the jury regarding this evidence was in disregard of the accompanying Bench Note requirements and vague, thereby constituting error. We conclude he has forfeited this argument by not first seeking a clarification of the instruction below and that any instructional error was harmless.

#### A. The Relevant Proceedings Below

Before trial, the People moved under Evidence Code sections 1108 and 1101 to admit evidence that defendant had previously sexually assaulted Jane Doe I and Jane Doe II.[7] Regarding Jane Doe I, the People sought to introduce evidence that defendant had "sexually assaulted [her] on several occasions in the past. The victim said she was

_____

[6] In light of our conclusions, we have no need to, and do not, resolve the parties' disagreement over whether the federal or state standard applies here.

[7] The People also moved for the admission of evidence that defendant sexually assaulted his wife in 1998, when she was a minor. Defendant does not raise any issues with this part of the People's motion, so we do not discuss it further.

first sexually assaulted by defendant when she was six years old. The defendant inserted his penis into both her vagina and anus approximately 10 to 20 times. The prior offenses occurred at the defendant's house in Moreno Valley, California. After the assaults, the defendant would tell Jane Doe I that something 'bad would happen to her' if she ever told anyone about the abuse."

Regarding Jane Doe II, the People sought to introduce evidence that defendant assaulted her when she was under 10 years old and they were visiting an aunt's house in Oakley. While Jane Doe II "was asleep on the couch, she woke up and felt her father putting his 'thing' into her 'back.' As a subsequent CIC forensic interview, [Jane Doe II] confirmed that the defendant had inserted his penis into her anus and was thrusting his body. [She] described the act as being painful. [She] pretended to wake up, and the defendant immediately stopped the sexual assault and returned to another couch to go to sleep."

Defendant filed a written opposition to the People's section 1108 evidence. He argued it should be excluded under Evidence Code section 352 for a variety of reasons, including that the girls had delayed reporting the incidents, their accounts were uncorroborated and too vague to be reliable, and defendant had not been convicted of any of the alleged offenses. Defendant also moved under Evidence Code section 782 to present evidence that Jane Doe II had been sexually molested by persons other than defendant, that Jane Doe I told her mother she had mistaken defendant for defendant's brother as the perpetrator of the prior assaults against her, and that Jane Doe I may have been assaulted by others as well. The People vigorously opposed admission of much of this evidence.

At the hearing on the motions, the court engaged in a lengthy discussion with counsel about the proffered evidence, asking questions that focused on the interrelationship of the evidence and its relevance to the present case. It then ruled that the People could question the girls regarding their allegations of defendant's prior sexual

23

assaults. Depending on the scope of the direct examinations, defense counsel would be allowed to ask the girls about prior assaults by defendant's brother, but not assaults by anyone else. The court indicated it was willing to revisit the issues during trial as well.

At trial, as we have discussed, after Jane Doe I testified that defendant had vaginally penetrated her, she was asked, "had [defendant] ever done anything like this to you before?" She said "he did" every time she went to his home in Los Angeles when she was six years old, usually in his bedroom. She answered affirmatively when asked if "this stuff happened" more than five times.

After Jane Doe I testified at trial, defense counsel again objected that Jane Doe II's allegation of defendant's prior assault of her was "very weak" and should not be admitted into evidence. The court pointed out that the defense was contending Jane Doe I was not telling the truth, making Jane Doe II's testimony of a prior assault relevant "not only of intent and perhaps other issues, but as something that the jury could take into consideration as to whether or not a victim . . . is a credible witness." The court indicated it would allow the People to present Jane Doe II's prior sexual offense testimony, based particularly on the prosecutor's representation that it also occurred at Esmeralda's house, a representation with which defense counsel disagreed. The court also indicated that should Jane Doe II testify, the defense would "be permitted to ask any and all questions relevant to her testimony and any bias she has to give evidence in a certain way," including about her cooperation in another criminal investigation regarding other individuals who might have sexually assaulted her. The court denied the People's request to allow the testimony of the investigating officer for that incident unless Jane Doe II's testimony provided additional reasons for the officer's testimony.

The next court day, the prosecutor reported that Jane Doe II said the prior incident with defendant "apparently took place at a different aunt's house, in Oakley, which is two streets away," and that Jane Doe II was "unable to pinpoint exactly when [the incident] happened," suggesting that it may have occurred six or more years before. This led to

24

another lengthy discussion between the court and counsel. Defense counsel argued the evidence was "so vague," and should be excluded under Evidence Code section 352. He also raised the evidence he sought to have admitted under Evidence Code section 782,[8] and the possibility of a hearing being conducted under that section.

The prosecutor countered that defendant's alleged prior assault of Jane Doe II was "very similar" to the present incident: [T]his is another minor that is a close family relative, that he is again opportunistic in a house that belongs to another relative, . . . sneaks in a sexual act. . . . It shows, again, the common scheme, the way in which he continues to act as a sexual deviant with close family members. [¶] In addition, it goes strictly against intent . . . that somehow this wasn't a forced act, but someone came on to the defendant in this case who was a minor . . . . I think it's extremely probative and I believe the circumstances as to why she delayed reporting are certainly explainable, given the close family relationship."

The court permitted the defense to raise with Jane Doe II that she had previously denied that defendant had sexually assaulted her, but not her testimony so indicating at a preliminary hearing in another investigation or the fact that there was another investigation into other people's assaults of her. However, defense counsel could cross-examine Jane Doe II about an officer asking her if defendant had done anything to her, without going into the parameters of the underlying investigation.

Jane Doe II testified that during one visit to a particular aunt's house in Oakley, she and her family slept in the living room. She woke up around 7:00 or 8:00 a.m. to discover defendant putting his penis "in" her "butt" and moving it back and forth. She turned around, saw defendant, and got up. She could not recall her age at the time.

The prosecutor relied on this prior uncharged sex offenses evidence in his closing

---

[8] Evidence Code section 782 governs the procedures for determining whether to admit evidence of sexual conduct of the complaining witness when offered to attack that witness's credibility.

argument. He referred to the "devastation defendant has caused to [Jane Doe I and] his own biological daughter." After quoting from the court's instruction regarding this evidence, he said the Legislature has "recognized that people who commit these types of offenses tend to do it again and again" and that this was "one of the few areas in the law in which you're actually allowed to consider whether someone having done this before is inclined to do this again." He also contended Jane Doe II's testimony showed that sodomy was an act "preferred" by defendant.

## B. Relevant Legal Standards

Generally, so-called "propensity evidence," meaning "evidence of a person's character or a trait of his or her character . . . offered to prove his or her conduct on a specific occasion," is inadmissible, including "evidence of specific instances of his or her conduct." (Evid. Code, § 1101, subd. (a).) However, "[b]y their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence," which "requires the trier of fact to make difficult credibility determinations." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) To contend with this problem, the Legislature adopted Evidence Code section 1108. It provides that in the trial of a defendant accused of a sexual offense, "evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).) Further, " ' "[a]s with other forms of relevant evidence that are not subject to any exclusionary principle, *the presumption will be in favor of admission*." ' " (*People v. Loy* (2011) 52 Cal.4th 46, 62.) This other sexual offense evidence may be considered " ' "as evidence of the defendant's disposition to commit such crimes, and for its bearing on the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense." ' " (*Falsetta*, at p. 912.)

Trial courts must carefully weigh other sexual offense evidence under Evidence Code section 352. (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 916.) "That provision

26

gives courts discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (§ 352.)" (*Ibid.*, italics omitted.) Courts "must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Id.* at p. 917.) Courts should keep in mind that "the probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense." (*Ibid.*)

"We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) "The trial court's "discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) In evaluating whether the trial court abused its discretion, "[w]e review the correctness of the trial court's ruling at the time it was made, . . . and not by reference to evidence produced at a later date." (*People v. Welch* (1999) 20 Cal.4th 701, 739.) It is defendant's burden to demonstrate that the trial court's decision was irrational, arbitrary, or not " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)

27

## C. The Trial Court Did Not Abuse Its Discretion in Admitting the Uncharged Sex Offenses Evidence.

Defendant contends that the trial court "failed to make an inquiry" into "any" of the factors it was required to consider, in particular whether the girls' testimony was "reliable," and implies the court's failure to conduct a hearing pursuant to Evidence Code section 402 was tantamount to error. We disagree.

We have no reason to doubt that the court carefully balanced the probative value and potential prejudice of the proffered evidence, as indicated by our summary of its lengthy discussions with counsel before and during trial. The proffered evidence was highly probative of Jane Doe I's credibility, which was at the center of the case. Defendant told Rivera during his interrogation that if he had a sexual encounter with Jane Doe I, it was against his best intentions, and that she was the aggressor who virtually forced his penis into contact with her vagina. But the proffered evidence indicated defendant had previously sexually assaulted both Jane Doe I and Jane Doe II. The proffered evidence that defendant sodomized Jane Doe II was particularly relevant to the count two charge, which alleged defendant had sodomized Jane Doe I. Also, none of the proffered evidence was unduly prejudicial in that it did not describe acts that were any more shocking than those defendant was alleged to have committed in the present case. Further, the People's proffer included significant and credible details, such as that defendant penetrated both Jane Doe I's vagina and anus with his penis 10 to 20 times at his home in Moreno Valley starting when she was six years old and sodomized Jane Doe II as she slept on a couch at another aunt's house in Oakley when she was less than 10 years of age. Also, given its highly probative value, the proffered evidence was not so vague as to be unduly prejudicial, confusing or misleading, or cause us to otherwise conclude the trial court abused its discretion by admitting it.

Finally, defendant does not indicate that he ever requested that the court conduct a hearing pursuant to Evidence Code section 402. He does not establish that the proffered

28

evidence contained indications of unreliability such that the court had a sua sponte duty to further review it, such as in a section 402 hearing, before determining its admissibility. Therefore, we reject this argument as well.

### D. Defendant Has Forfeited His Claim That the Court Erroneously Instructed the Jury About the Prior Uncharged Sex Offenses Evidence, and Any Error Was Harmless.

Defendant next contends that the trial court erroneously and prejudicially instructed the jury about how to consider the prior uncharged sex offenses evidence presented via the testimony of Jane Doe I and Jane Doe II in a manner that lessened the prosecutor's burden of proof, violating his constitutional rights under the Sixth and Fourteenth Amendments of the United States Constitution.

The trial court instructed the jury regarding the prior uncharged sex offenses evidence based on a modified version of CALCRIM No. 1191A. In its generic form, this instruction begins with the following paragraph:

"The People presented evidence that the defendant committed the crime[s] of— *<insert description of offense*[*s*]*>* that (was/were) not charged in this case. (This/These ) crime[s] (is/are) defined for you in these instructions." (CALCRIM No. 1191A.)

The Bench Notes accompanying the instruction states: "In the first sentence, the court must insert the name of the offense or offenses allegedly shown by the evidence. The court **must** also instruct the jury on elements of the offense or offenses."

However, the trial court instructed the jury with this modified version of the instruction's first paragraph:

"The People presented evidence that the defendant committed other sexual assault offenses against Jane Doe #1 and Jane Doe #2 that were not charged in this case."

The court further instructed, "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses."

Defendant contends the court's failure to identify the specific "other sexual assault

29

offenses" he committed against Jane Doe I and Jane Doe II "left vague" which crimes were involved, were contrary to the requirements outlined by the Bench Notes to the instruction and had the effect of lowering the prosecution's burden of proof.

The People first argue that defendant did not object to the instruction as given and, therefore, has forfeited his appellate claim. We agree, based on our own research. Defendant's argument amounts to the contention that the court's instruction was too general and incomplete. However, he did not request any clarification to this instruction in the trial court. "The longstanding general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 150–151 [defendant forfeited claim that an instruction's reference to "sexual intercourse" was inadequate by failure to seek clarification below], overruled in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) As a result of his failure to request a clarifying instruction, defendant "may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete.' [Citations.] Defendant's failure to either object to the proposed instruction or request [additional] language be given to the jury forfeits his claim on appeal." (*People v. Valdez* (2004) 32 Cal.4th 73, 113.)

Regardless of defendant's forfeiture, any error by the trial court was harmless. The court was not required to give further instructions under the circumstances. Bench Notes "do not 'have the force of law.' " (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1381, quoting *People v. Alvarez* (1996) 14 Cal.4th 155, 223, fn. 28.) Rather, the court was required to "instruct the jury on the points of law applicable to the case, and no particular form is required as long as the instructions are complete and correctly state the law. [Citation.] In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) "The relevant inquiry . . . is

30

whether, 'in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice.' [Citation.] Also, ' " 'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.)

It would have been better practice for the trial court to instruct the jury on what specific past sexual offenses defendant was alleged to have committed against Jane Doe I and Jane Doe II. Nonetheless, it is not reasonably likely that the jury understood the court's instruction in a manner that violated defendant's rights in determining whether he committed a prior sexual offense against Jane Doe II, viewing her testimony and jury instructions as a whole. Jane Doe II plainly indicated defendant sodomized her one morning in the living room of an aunt's house in Oakley, California. Her account left no doubt about the nature of defendant's action. Further, in connection with the charges based on defendant's actions on April 17, 2011, against Jane Doe I, the jury was instructed on the elements for aggravated sodomy of a child under the age of 14 and seven or more years younger than defendant (§ 269, subd. (a)(3)) and a forcible lewd act upon and with the body of a child under the age of 14 (§ 288, subd. (b)(1)). Given this record and the instructions as a whole, including the clear instruction that the jury could consider the evidence only if the People had proved defendant committed the uncharged offenses, we think the jurors likely understood the court's instruction to require them to find, by a preponderance of the evidence, that defendant committed either aggravated sodomy or a forcible lewd act against Jane Doe II. It is not reasonably likely that they understood the instruction so as to violate defendant's rights.

However, we are doubtful the jury was able to properly determine whether it could consider Jane Doe I's testimony about defendant's prior sexual acts regarding her given the vagueness of the instruction. Jane Doe I was asked, and testified, only generally about what defendant did to her in his bedroom at his home when she was six years old,

31

and the court's instruction compounded the problem of determining whether defendant had committed a particular prior sexual offense against her. While Jane Doe I's testimony indicated that defendant repeatedly sexually assaulted her in some manner when she was six years old, she was not asked to, and did not, identify the specific nature of his actions. She had testified that on the day of the incident, defendant had both touched her inappropriately and vaginally penetrated her with his penis. After testifying about this, she was asked, "had [defendant] ever done anything *like this* to you before?" She replied only, "he did," and then affirmatively answered when asked if "*this stuff* happened" more than five times. (Italics added.) If the court had instructed the jury to determine based on a preponderance of the evidence whether defendant had in the past committed a specific sexual offense against Jane Doe I, the jury might have been able to determine from her testimony as a whole whether or not he had. But the court's instruction did not identify any specific prior offenses. This left the jury without sufficient guidance as to whether defendant's prior acts regarding Jane Doe I constituted a crime and whether they could therefore consider that evidence. It is thus possible that the jury decided defendant committed some unspecified sexual assaults on Jane Doe I and proceeded to consider that evidence in support of the charged offenses.

Although we conclude that the trial court erred in instructing the jury regarding the evidence of prior sexual offenses against Jane Doe I, we also conclude the error was harmless, whether evaluated under the federal or state standard.[9] (See *Chapman v. California*, *supra*, 386 U.S. at p. 24 [federal]; *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [state].) The brevity and lack of detail in Jane Doe I's testimony about defendant's prior sexual acts was not likely to bring greater opprobrium to defendant in the jury's eyes than the offenses with which he was charged. The evidence against defendant on

---

[9] In light of our conclusion, we again have no need to, and do not, resolve the parties' disagreement over whether the federal or state standard of prejudice applies here.

those charges was overwhelming.  Not only was Jane Doe I consistent and detailed in her accounts about what he did to her in Esmeralda's bedroom, but defendant himself admitted to Detective Rivera that he had vaginally penetrated her.  His contention that Jane Doe I, a 12-year-old girl, was "crazy" for sex with him, a 47-year-old man, was far-fetched to say the least.  Given his initial statements to Rivera, the different story he presented at trial, when he testified that he had no physical contact with Jane Doe I at all while he was in the bedroom, was equally far-fetched.  Indeed, his incredible and changing stories provided further evidence of his guilt.  Jane Doe I's testimony, moreover, was corroborated by the sexual assault examination evidence, such as the fissure and bruising of her anus and rectum and the abrasion of her perineum.  Finally, Jane Doe II's testimony that defendant had previously sodomized her provided further corroboration.  Given this record, the error by the court in instructing the jury regarding the prior uncharged sexual offenses against Jane Doe I evidence was harmless.

## IV.

### *Defendant's Challenges to the Trial Court's Victim Restitution Order Fail.*

Next, defendant argues that the trial court's victim restitution order that he pay $75,000 to Jane Doe I for her noneconomic losses violated his state and federal constitutional rights to equal protection and to a jury trial, and was an abuse of discretion.  These claims also lack merit.

### A.  The Relevant Proceedings Below

The trial court imposed on defendant a victim restitution order under section 1202.4, subdivision (f)(3)(F) for Jane Doe I's noneconomic losses in the amount of $75,000, to be paid at a rate of $75 per month or 50 percent of his monthly income while in prison, whichever is less.  The court ordered less than the $500,000 the People requested, explaining, "[T]he $75,000 here is no more or less rational than $150,000 or a million dollars, whatever the figure the Court picked out of the air would not be, in the Court's view, a true reflection of the incalculable disaster that this case has visited upon

33

the victim. [¶] So the Court is at least taking a figure which if paid out at the rate that the Court is indicating would never be satisfied in the lifetime of Mr. Garcia anyway. [¶] So long as he remains in custody, and even if he works at the prison, he would not be able at this rate to pay out the $75,000 that the Court is imposing in any event. [¶] The Court's view is that in part the amount is symbolic and in part the amount is real. The Court is not inclined to simply select some humongous amount of money to impress upon anybody, in particular the fact that this type of offense causes a severe harm which simply can't be measured in dollars. [¶] And so the Court's view is that it's a better approach to [take a] more realistic amount that results [in], if it's going to result in anything at all, some payment of money in real dollars and sent to the victim from the defendant here without the hyperbole of imposing some huge amount of money that has no realistic connection to reality here."

## B. Defendant's Claim That the Court's Restitution Order Violated His Equal Protection Rights Lacks Merit.

Defendant first argues that the statute under which the trial court's restitution order was issued, section 1202.4, subdivision (f)(3)(F), violates his equal protection rights under the state and federal Constitutions because it does not apply to all offenders who sexually molest children. This argument lacks merit.

Section 1202.4, subdivision (f)(3)(F) provides that, subject to exceptions not relevant here, the sentencing court shall order victim restitution in "a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to [¶] . . . [¶] "(F) "Noneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." Section 288 provides under subdivision (a) that "any person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of

34

arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony," and under subdivision (b) that any person who commits such an act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony and shall be punished by imprisonment in the state prison for 5, 8, or 10 years." Defendant was convicted under section 288, subdivision (b).

The Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution require that " 'all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.' " (*Engquist v. Oregon Dept. of Agriculture* (2008) 553 U.S. 591, 602 [regarding the Equal Protection Clause]; *People v. Cruz* (2012) 207 Cal.App.4th 664, 674 [" 'The equal protection guarantees of [both Constitutions] are substantially equivalent and analyzed in a similar fashion' "].) Under equal protection analysis, we must first determine whether persons are similarly situated for purposes of the law challenged. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1193, 1199–2000 (*Hofsheier*), overruled on other grounds in *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881–888 (*Johnson*).) If they are similarly situated, the parties do not disagree that under the circumstances of this case, we determine whether there is a rational basis for the differential treatment, as opposed to strictly scrutinizing the difference. (*People v. Smith* (2011) 198 Cal.App.4th 415, 435 (*Smith*) [applying the rational basis test to an equal protection challenge to a restitution order under section 1202.4, subdivision (f)(3)(F)].)

Defendant argues there is no rational basis for singling out defendants who have committed felony violations of section 288, as opposed to other felony sex offenders against minors. He specifically refers to those who engage in unlawful intercourse with

35

persons under the age of 18 in violation of section 261.5,[10] or those who sexually assault a child under the age of 14 who is at least seven years younger than the perpetrator, in violation of section 269.[11]

---

[10] Section 261.5 provides in relevant part:

"a) Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor. For the purposes of this section, a 'minor' is a person under the age of 18 years and an 'adult' is a person who is at least 18 years of age.

"(b) Any person who engages in an act of unlawful sexual intercourse with a minor who is not more than three years older or three years younger than the perpetrator, is guilty of a misdemeanor.

"(c) Any person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty of either a misdemeanor or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170.

"(d) Any person 21 years of age or older who engages in an act of unlawful sexual intercourse with a minor who is under 16 years of age is guilty of either a misdemeanor or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years."

[11] Section 269 provides in relevant part:

"(a) Any person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child:

"(1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261.

"(2) Rape or sexual penetration, in concert, in violation of Section 264.1.

"(3) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286.

"(4) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 288a.

A related argument was rejected by the Third Appellate District in *Smith*, *supra*, 198 Cal.App.4th 415. There, the defendant argued that the same provision of section 1202.4 violated his equal protection rights because it did not treat offenders of other sex crimes against adults the same way. The *Smith* court concluded that "[d]ifferentiating between child victims and other victims is rational based on the vulnerability of children in general and society's interest in protecting children. Therefore, even though section 1202.4 allows restitution orders for noneconomic damages against child molesters only, it does not violate the equal protection provisions of either the federal or state Constitutions." (*Smith*, at p. 435.)

Defendant rightly points out that *Smith* did not address his contention that he should not be treated differently than offenders who commit other sex crimes against minors. He argues his case is like *Hofsheier*, *supra*, 37 Cal.4th at page 1193. There, the defendant was convicted under section 288a, subdivision (b)(1) of voluntary oral copulation with a minor 16 or 17 years of age, mandating that he register for life as a sex offender. The defendant claimed the mandatory registration requirement violated his right to equal protection because defendants convicted of voluntary sexual intercourse with minors of the same age under section 261.5, subdivision (c) were subject to discretionary registration. (*Hofsheier*, at p. 1192.) Our Supreme Court agreed. It held that defendants convicted of voluntary oral copulation with minors 16 to 17 years old and defendants convicted of voluntary intercourse with minors in that same age group were similarly situated for equal protection purposes. (*Id.* at p. 1200.) The court further held that there was no rational basis for the different registration procedures and, therefore, that the defendant's mandatory registration violated his constitutional rights. (*Id*. at p. 1207.)

---

"(5) Sexual penetration, in violation of subdivision (a) of Section 289.

"(b) Any person who violates this section is guilty of a felony and shall be punished by imprisonment in the state prison for 15 years to life."

37

However, after the briefing was completed in this case, this holding of *Hofsheier* was overruled in *Johnson*, *supra*, 60 Cal.4th 871. There, our Supreme Court concluded there *was* a rational basis for the different registration procedures and overruled *Hofsheier*'s holding that these differences amounted to an equal protection violation. (*Johnson*, at pp. 881–888.)

In any event, there was no equal protection violation here. Defendant argues that the other sex offenders he identifies are similarly situated and that section 1202.4, subdivision (f)(3)(F) improperly distinguishes between offenders based only on the nature of the sexual act. We agree that violators of sections 288, 261.5 and 269 are similarly situated as sex offenders of minors. (See *Hofsheier*, *supra*, 37 Cal.4th at p. 1200 [finding persons convicted of oral copulation with minors and persons convicted of sexual intercourse with minors to be " 'sufficiently similar to merit application of some level of scrutiny' "].) However, we conclude there is a rational basis for treating section 288 violators differently. Only one of the statutes defendant identifies, section 269, focuses on children under the age of 14; section 261.5 applies to the much broader category of all persons under 18, including those between 14 and 17 years old. Second, section 288, subdivision (b) requires that the perpetrator of the forcible lewd acts commit them with the specific intent to arouse either himself or herself, or the child (or dependent person). (§ 288, subds. (a), (b)(2).) Neither section 261.5 or 269 require this specific intent, nor do the particular offenses for which section 269 applies, they being rape or sexual penetration (§§ 261, 264.1), sodomy (§ 286), oral copulation (§ 288a) and foreign object penetration (§ 289). (See, e.g., *People v. Whitman* (1995) 38 Cal.App.4th 1282, 1292 ["rape (§ 261), sodomy (§ 286), and oral copulation (§ 288a) are all general intent crimes and, hence, contain no 'sexual gratification' specific intent element, while the only specific intent involved in foreign object penetration (§ 289) is a purpose of sexual arousal, gratification, *or* abuse"].)

Accordingly, we conclude the Legislature's decision to provide noneconomic

38

damages only for victims of defendants convicted of violating section 288 bears a rational relationship to a legitimate state purpose. It is reasonably based on the understanding that section 1202.4, subdivision (f)(3)(F), by focusing on noneconomic reimbursement for section 288 victims, uniquely focuses on specific intent sex crimes against particularly vulnerable victims, young children (and dependent persons), which are especially egregious and harmful. Defendant's equal protection rights were not violated by the court's restitution order pursuant to section 1202.4, subdivision (f)(3)(F).

## C. Defendant Has Forfeited His Claim That the Court's Restitution Order Violated His Sixth Amendment Right to a Jury Trial.

Defendant next argues the court's restitution order violates his Sixth Amendment right to a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Southern Union Co. v. United States* (2012) 567 U.S. 343 (*Southern Union*) because it constitutes punishment and exceeds the statutory maximum penalty allowed for his crimes.

The People contend that defendant did not make these claims below at sentencing and, therefore, has forfeited them. We agree. "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356; see also *id*. at pp. 352–353 [the waiver doctrine applies "to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].)

We also conclude defendant's arguments fail on their merits. In *People v. Millard* (2009) 175 Cal.App.4th 7 (*Millard*), the Fourth Appellate District rejected a very similar Sixth Amendment argument because section 1202.4 does not constitute increased punishment for a crime. (*Millard*, at p. 35.) The court noted, " 'Although [victim] restitution has an element of deterrence [citation], the primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime. [Citations.] Compensation is the defining feature of civil law. [Citations.] Postcriminal

39

proceedings vindicating the remedial purpose of reimbursement have long been treated as not constituting punishment for double jeopardy purposes.' " (*Ibid.*, quoting *People v. Harvest* (2000) 84 Cal.App.4th 641, 648, followed in *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1184.)  We agree with this analysis.

*Southern Union*, *supra*, 567 U.S. 343, decided after *Millard*, does not change our conclusion.  There, the court struck down a criminal fine that was imposed pursuant to a criminal statute because it was in excess of the amount authorized by facts determined by the jury.  This analysis also does not apply to restitution.  The fine in *Southern Union* clearly was punishment (see., e.g., *Southern Union*, at pp. 347, 349 [referring to fine prescribed by the relevant statute as punishment]).  The court's analysis was based on the *Apprendi* rule that " 'any fact that increases *the penalty for a crime* beyond the prescribed statutory maximum must be submitted to a jury . . . ." (*Id.* at p. 348, italics added.)  As the Fourth Appellate District concluded in *People v. Pangan* (2013) 213 Cal.App.4th 574, "neither *Southern Union* [nor] *Apprendi* . . . have any application to direct victim restitution, because direct victim restitution is not a criminal penalty." (*Id.* at p. 585.)  Therefore, the court held, defendant had no right to a jury trial on his restitution issue.  We agree with *Pangan*'s analysis and holding, and follow them here.

In any event, defendant does not establish that the court's restitution order exceeds any statutory maximum.  The governing statute, section 1202.4, subdivision (f)(3)(F), does not limit the amount the court can order (see *Harvest*, *supra*, 84 Cal.App.4th at p. 649 ["victim restitution . . . is unlimited in the amount that can be ordered"]) and, as we will further discuss, a trial court " ' "has broad discretion in making a restitution award." ' " (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320.)  Although "that discretion is not unlimited" (*ibid.*), defendant fails to establish any statutory maximum was exceeded.

### D. Defendant's Claim That the Court's Restitution Order Violated His Right to a Jury Trial Under the California Constitution Lacks Merit.

Defendant also contends that the trial court's order that he pay $75,000 in restitution to Jane Doe I for her noneconomic damages violated his state constitutional right to a jury trial. This argument also lacks merit.[12]

Article I, section 16 of the California Constitution states, "Trial by jury is an inviolate right and shall be secured to all . . . ." Defendant cites this constitutional mandate, discusses case law regarding a person's rights to a jury trial on civil claims for noneconomic damages resulting from intentional torts, discusses other case law that distinguishes between civil liabilities and criminal penalties, and concludes section 1202.4, subdivision (f)(3)(F) "transfers the assessment of the amount of noneconomic damages from the jury in the civil court to the judge in the criminal court" and "violates the defendant's rights under the California Constitution to a jury trial on noneconomic damages."

Defendant's argument is unpersuasive. It ignores the other key mandate in our state Constitution, from which section 1202.4 flows. Article I, section 28, subdivision (b), the "Victims' Bill of Rights," provides, among other things, that, "[i]n order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled [¶] . . . [¶] (13) To restitution." "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).)

---

[12] The People raise forfeiture in their heading on this topic, but not in the body of their argument, and they do not cite anything in the record or in law to support it. Therefore, we disregard the People's forfeiture assertion. (*Sporn v. Home Depot USA, Inc.* (2005) 126 Cal.App.4th 1294, 1303 ["Contentions on appeal are waived by a party who fails to support them with reasoned argument and citations to authority"].)

"Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (*Id.*, subd. (b)(13)(B).)

Article I, section 28, subdivision (b) "is not self-executing" and it "directed the Legislature to adopt implementing legislation." (*People v. Giordano* (2007) 42 Cal.4th 644, 652.) As this court has pointed out, "[s]ection 1202.4 was the legislative response." (*People v. Chappelone*, *supra*, 183 Cal.App.4th at p. 1172.) "Restitution hearings held pursuant to section 1202.4 are sentencing hearings and are thus hearings which are a significant part of a criminal prosecution. [Citation.] Restitution orders have as their goal economic compensation for the victim or victims of a defendant's crime, rehabilitation of the defendant, and the deterrence of the defendant and others from committing future offenses." (*People v. Dehle* (2008) 166 Cal.App.4th 1380, 1386.)

Thus, the Victims' Bill of Rights requires our criminal courts to follow the constitutional mandate that a defendant upon conviction must be ordered to pay restitution to the victims, and directs the Legislature to charge the courts with the authority to fulfill that mandate in sentencing proceedings conducted under section 1202.4. The criminal courts doing so does not usurp any role normally played by juries in civil cases.

The question of whether a defendant is entitled to a jury trial regarding noneconomic victim restitution was considered and rejected in *Smith*. There, the court ordered a defendant convicted of child molestation to pay restitution to the victim in the amount of $753,265, of which $750,000 was for noneconomic damages. (*Smith*, *supra*, 198 Cal.App.4th at pp. 419–420.) Defendant argued he was entitled to a jury trial on the propriety and amount of noneconomic damages, which, defendant argued, are both subjective and indistinguishable from noneconomic damages in the civil trial context. (*Id.* at pp. 433–434.)

The *Smith* court disagreed with defendant's two arguments. It concluded, "As a

sentencing order, a restitution order for noneconomic damages does not give rise to a jury trial right." (*Smith*, *supra*, 198 Cal.App.4th at p. 433.) Defendant's contention that the subjective nature of noneconomic damages merited a jury trial "has no merit because there is no basis for distinguishing jury trial rights, or lack thereof, for restitution orders for economic damages and restitution orders for noneconomic damages. In both cases, the trial court is performing a task that, in a civil case, a jury would perform." (*Ibid*.)

The *Smith* court also rejected the defendant's argument that restitution of noneconomic damages under section 1202.4 was indistinguishable from a civil jury award for noneconomic damages. The court wrote, "While the restitution order and the civil jury award produce the same result (an enforceable judgment against the defendant [citation], they are a different means to that end, one based in the civil law, with its protections and requirements, and the other in criminal law, with its own protections and requirements. The restitution hearing, whether for economic or noneconomic damages, is a criminal sentencing hearing, not a civil trial." (*Smith*, *supra*, 198 Cal.App.4th at p. 434.)

*Smith*'s analysis is consistent with our view of the Victims' Bill of Rights and we follow it. The court's restitution order did not deny defendant any right to a jury trial under the California Constitution.[13]

---

[13] The "right to a jury trial is the right as it existed at common law, when the state Constitution was first adopted." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 75–76.) Recently our Supreme Court held that *Apprendi*'s Sixth Amendment jury right did not apply to sex offender registration and residency requirements because these are "modern regulatory sentencing imperatives" and, therefore, the jury did not play any traditional role regarding these matters at common law. (*People v. Mosley* (2015) 60 Cal.4th 1044, 1059–1060.) We do not rely on *Mosely* because it was published after briefing was completed in this case. We do not further explore a jury's role, if any, at common law regarding restitution because the parties have not raised it.

### E. Defendant Has Forfeited His Claim That the Court's Restitution Order Was an Abuse of Discretion.

Finally, defendant argues the trial court's $75,000 restitution order was an abuse of discretion because the court did not use a rational method of calculation.

The People note that defendant did not make this claim below at sentencing and contend that he has therefore forfeited it. We agree. (*People v. Scott*, *supra*, 9 Cal.4th at pp. 352–353, 356.)

We also reject defendant's argument on its merits. We review a restitution order for abuse of discretion. (*Smith*, *supra*, 198 Cal.App.4th at p. 435.) As we have discussed, "victim restitution . . . is unlimited in the amount that can be ordered." (*Harvest*, *supra*, 84 Cal.App.4th at p. 649.) Nonetheless, the trial court's broad discretion " ' "is not unlimited. While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." ' " (*People v. Holmberg*, *supra*, 195 Cal.App.4th at p. 1320.) Generally, " ' "[w]hen there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' " (*Ibid.*)

"Unlike restitution for economic loss, however, loss for noneconomic loss is subjectively quantified." (*Smith*, *supra*, 198 Cal.App.4th at p. 436.) Therefore, as did the *Smith* court, we find guidance in the civil jury instructions concerning noneconomic loss and shall "affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court." (*Ibid.*, citing CACI No. 3905A (2009 ed.), *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507.) The court's $75,000 restitution order meets this standard, and was based on a practical, measured approach to the issue. The court, having heard Jane Doe I's testimony and the related evidence of defendant's assault of her, concluded that no amount of money could compensate her for her noneconomic

44

losses.  It picked a monetary figure that would, based on the limitations of appellant's ability to earn money while serving a life sentence, require him to pay half of his monthly income while in prison.  The court's practical approach, tied to appellant's economic reality, was not arbitrary or capricious, nor does it "shock the conscience or suggest passion, prejudice or corruption on the part of the trial court."  (*Smith*, at p. 436.)  The court did not abuse its discretion in ordering defendant to pay $75,000 in victim restitution.

**V.**

***Defendant's Sentence of Life Without Parole Does Not Violate His Federal or State Constitutional Rights Against Cruel or Unusual Punishment.***

Finally, defendant argues his sentence of life without the possibility of parole violates his federal and state Constitutional rights against cruel and unusual punishment. This argument also lacks merit.

### A.  The Relevant Proceedings Below

At sentencing, defense counsel argued that a sentence of life without the possibility of parole for felony sexual assault against a child with a burglary enhancement allegation constitutes cruel and unusual punishment under both the state and federal constitutions.  He characterized the People's charging decision as arbitrary because defendant did not engage in the kind of conduct intended to be targeted by the first degree burglary allegation.  He questioned whether the fact that "somebody crosses a threshold in a house where they are a guest as is [*sic*] a victim" was "somehow sufficient to elevate a ten-year maximum to a life without a possibility of parole sentence," and argued that such an elevated sentence was grossly disproportionate to the crime in this case and unconstitutional.

The prosecutor responded that use of the burglary allegation was proper in this case because "defendant violated the trust of the homeowner," and engaged in conduct even more egregious than the typical burglary situation, since he "lured the family into a

45

false sense of security and he violated their trust." The sentence did not shock the conscience because defendant "took advantage of the trust of family members."

The court, characterizing the issue as one implicating the Eighth Amendment, rejected defendant's argument: "[W]ithout a detailed pleading on [defendant's] part . . . , it's very tough for the Court to say off the top of its head, this sentence strikes me as disproportionate to sentences for similar conduct that it understands are imposed in other places or as to other defendants. It doesn't strike me that aggravated rape against a young girl under the age of 14 resulting in a life without parole sentence would necessarily be a punishment that was so disproportionate to the offense that one would say the constitution was violated." The court concluded it was "not apparent . . . that the sentence that is mandated under the law here is—an Eighth Amendment violation by any stretch of the imagination."

### B. Relevant Legal Standards

"The purpose of the One Strike law is 'to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction,' 'where the nature or method of the sex offense "place[d] the victim in a position of *elevated vulnerability*." ' " (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 186.) As we have discussed, defendant was sentenced to a life without parole sentence because he committed a forcible lewd act against a child under the age of 14 during the commission of a first degree burglary, one of a number of violent, multiple crimes for which this sentence must be imposed under the One Strike law. (§ 667.61.)

Regarding federal law, the Eighth Amendment of the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." It "prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime." (*Rummel v. Estelle* (1980) 445 U.S. 263, 271.) This is "a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20.) It " 'does not

46

require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are 'grossly disproportionate' to the crime.' " (*Graham v. Florida* (2010) 560 U.S. 48, 59–60 (*Graham*).) In reviewing the length of a term-of-years sentence, as opposed to a death sentence, we consider "all of the circumstances in a particular case." (*Id*. at p. 59.)[14] In evaluating a term-of-years sentence, "[a] court must begin by comparing the gravity of the offense and the severity of the sentence. [Citations.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Id*. at p. 60.)

Regarding state law, article I, section 17 of the California Constitution states, "Cruel or unusual punishment may not be inflicted or excessive fines imposed." A prison sentence violates article I, section 17, if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) "*Lynch* suggests three areas of focus: (1) the nature of the offense and the offender; (2) a comparison with the punishment imposed for more serious crimes in the same jurisdiction; and (3) a comparison with the punishment imposed for the same offense in different jurisdictions. [Citation.] Disproportionality need not be established in all three areas." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.) "The importance of each prong depends on the specific facts of each case and application of the first prong alone may suffice in determining whether a punishment is cruel and unusual." (*In re DeBeque* (1989) 212 Cal.App.3d 241, 249.) A

---

[14] The *Graham* court included a life without parole sentence in its discussion of "term of years" sentences. (*Graham*, *supra*, 560 U.S. at p. 59.)

look at the nature of the offense "includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts," and "an inquiry into whether 'the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' " (*People v. Thongvilay* (1998) 62 Cal.App.4th 71, 88.)

### C. Analysis

Defendant contends that his life sentence without the possibility of parole was cruel and unusual punishment given the particular circumstances of his case. His argument is unconvincing.

First, defendant points out that he had no criminal record, was married for about 20 years, employed for 17 years, reported no substance abuse problems and received a score on a Static 99R test indicating he was a low risk for committing another sexual offense if released on probation based on his age. These factors are not dispositive given the heinousness of his crimes and the dangers they present. Defendant raped and sodomized Jane Doe I, his 12-year-old niece, in the home of his sister-in-law Esmeralda, at a time when he knew Esmeralda and other relatives were away celebrating a family event. In the past, he had sodomized his own daughter, although he apparently was never prosecuted for this act.[15] After sexually assaulting Jane Doe I in the charged offense, he denied responsibility and attempted to justify his conduct by accusing a 12-year-old child of being the aggressor who "wants sex like crazy." At trial, he claimed in effect that Jane

---

[15] In light of our conclusion that the court erred in instructing the jury regarding the evidence that defendant committed prior sexual offenses against Jane Doe I, we do not refer to this evidence in this discussion. However, we do not mean by our omission to raise any questions regarding Jane Doe I's veracity about these prior incidents. Indeed, the jury obviously considered her credible in general. We simply cannot ascertain with certainty from the record the exact nature of defendant's prior conduct.

48

Doe I was lying altogether and that no sexual contact had occurred. Defendant thus committed heinous crimes against two young children—indeed, children in his own family, and blamed his victim, Jane Doe I, rather than acknowledging his own responsibility. It is not a leap to conclude he poses a grave danger to society.

Second, defendant argues that although he was convicted of a serious criminal act in sexually assaulting Jane Doe I, the burglary did not involve a physical invasion of Esmeralda's home, and that such an invasion was an aspect of numerous cases he cites that found indeterminate life sentences were not cruel and unusual. (See, e.g., *People v. Alvarado*, *supra*, 87 Cal.App.4th at pp. 199–201 [a One Strike sentence of 15 years to life for rape during commission of burglary was not cruel and unusual punishment, including because of the "substantial" "double trauma" of a home invasion and sexual violation].) He argues without citing any legal authority that the prosecutor's focus below—that his burglary was a breach of family trust—was never an interest to be protected by the burglary statute, as opposed to a physical invasion, which could in particular result in excessive violence. He further contends, incorrectly as we have discussed, that he had a possessory interest in the room where the assault occurred and that he could not have been charged with a separate crime of burglary.

Defendant's contention that his sentence is unjust given the supposedly unusual nature of his burglary does not withstand even modest scrutiny. As we have discussed, his actions *did* constitute a burglary, and a particularly harmful and egregious one at that. Defendant, *because* of his status as an invited overnight guest, was aware that Esmeralda and other family members were elsewhere attending a baby shower. He took advantage of this knowledge to forcibly rape and sodomize Jane Doe I while they were alone in the house together. When Esmeralda and her daughter returned unexpectedly, he merely removed himself to another area of the house as if nothing had occurred and later denied that he had done anything wrong. Again, he took advantage of his status as an invited overnight guest to explain his presence in the bedroom with Jane Doe I. This type of

49

burglary was as heinous and as dangerous as what defendant characterizes as the more common physical invasion of a home. Defendant physically violated Jane Doe I, and also violated Esmeralda's possessory interest in maintaining a safe home for herself, her family and her visitors. Further, defendant's argument is based on the false premise that a home invasion is more likely to lead to excessive violence. Here, if, for example, Esmeralda or another relative had found defendant in the act of sexually assaulting Jane Doe I, who can say this would not have led to excessive violence? We cannot readily distinguish between the potential for violence inherent in these two scenarios, and in any event that is an issue for the Legislature, not us.

As the prosecutor argued here: "The reason we have burglary statutes is because there are certain areas in certain locations that people hold to be sacred. . . . [¶] The manner in which the defendant violated the trust of the homeowner in this situation is the very reason why this burglary is—were even [more] [*sic*] egregious than perhaps the stranger who comes into a random house, because in this situation he conned the family and he lured the family into a false sense of security and he violated their trust. He made them appear as if he was just going to be a welcome house guest who was just going to be there spending the night, but instead he turned what was an open invitation into an opportunity to commit the most violent type of offense, forcible rape and sodomy on a minor."

Finally, defendant's score on the Static 99R test indicating he was in the low risk category for recidivist conduct based on his age, 47 at the time of the incident, is undermined by the evidence that in the past he sodomized his own 12-year-old daughter. His lack of a criminal record shows only that he avoided detection, not that he did not commit prior crimes.

Thus, we conclude that the gravity of defendant's crimes (the commission of a forcible lewd act upon a child under the age of 14 in the course of a first degree burglary) and all of the related circumstances, including defendant's own statements blaming Jane

50

Doe I instead of himself, support his sentence of life without the possibility of parole, and this sentence is not cruel and unusual punishment under either the federal or state Constitution.

In light of our conclusion that defendant's crime and culpability are particularly heinous and egregious, we need not discuss at length his contentions regarding the second and third prongs of the *Lynch* test, a comparison of his sentence to punishment for other offenses in this and other jurisdictions. (*Graham*, *supra*, 560 U.S. at p. 59; *In re DeBeque*, *supra*, 212 Cal.App.3d at p. 249.) Defendant lists a number of single offenses that California law punishes by life without possibility of parole and points out that most involve death or the likely of death of the victim. A similar argument was rejected in *People v. Crooks* (1997) 55 Cal.App.4th 797, which found a 25-to-life sentence was not cruel and unusual for the crime of rape of an adult woman during the course of a burglary. The *Crooks* court concluded that "the gravity of the two crimes committed by the defendant (burglary and rape) is greater than the sum of their parts: being raped in her own home is a woman's worst nightmare." (*Id*. at p. 807.) The same reasoning applies here, and the more severe life without possibility of parole sentence here is merited by the particular vulnerability of the victim, a 12-year-old child.

Regarding the third prong, punishment in other jurisdictions, defendant does not cite sentences involving the commission of a forcible lewd act on a child under the age of 14 during a first degree burglary. Further, even if California's sentencing scheme "is among the most extreme in the nation," such a determination "does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)[16]

_____

[16] In *People v. Reyes* (2016) 246 Cal.App.4th 62, the Fourth Appellate District recently found a "One Strike" sentence of life without the possibility of

51

And in any event, in *Harmelin v. Michigan* (1991) 501 U.S. 957, the United States Supreme Court rejected the claim that a defendant's life sentence without the possibility of parole for possessing a large amount of cocaine was cruel and unusual punishment, a conclusion reached in the course of analyzing whether this was an extreme sentence that was grossly disproportionate to the crime. (*Graham*, *supra*, 560 U.S. at pp. 59–60.) In light of that holding and our analysis herein, we conclude defendant's sentence of life without the possibility of parole for committing a forcible lewd act against a child under the age of 14 in the course of a first degree burglary was not cruel and unusual punishment.

## DISPOSITION

The judgment is affirmed.

---

parole was not cruel and unusual punishment for a defendant who was convicted of sexually assaulting a minor in the course of a first degree burglary under circumstances very similar to this case. We do not rely on this case because it was issued after the close of briefing in this case.

_____
STEWART, J.

We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.

*People v. Garcia* (A139924)

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. Charles B. Burch

Counsel:

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Juliet B. Haley, Deputy Attorney General, for Plaintiff and Respondent.